1  ROBINSON, BRADSHAW & HINSON, PA
   NATHAN C. CHASE, JR. (SBN 247526)
2  101 N. Tryon Street
   Suite 1900
3  Charlotte, North Carolina 28246
   Telephone: 704.377.2536
4  Facsimile: 704.378.4000
   E-mail: nchase@rbh.com
5
   Attorney for *Amicus Curiae*
6  THE SOUTHEASTERN CONFERENCE

7

8 **UNITED STATES DISTRICT COURT**

9 **NORTHERN DISTRICT OF CALIFORNIA**

10 **SAN FRANCISCO DIVISION**

11

| | |
|---|---|
| 12 | Case No.  4:11-MC-80300 CW (NC) |
| 13 | Related Case:  4:09-CV-1967 CW (NC) |
| 14 | |
| 15 **IN RE NCAA STUDENT-ATHLETE NAME & LIKENESS LICENSING LITIGATION** | *AMICUS CURIAE*  BRIEF OF THE SOUTHEASTERN CONFERENCE CONCERNING PLAINTIFFS' MOTIONS TO COMPEL AGAINST THE BIG TEN CONFERENCE AND THE BIG TEN NETWORK |
| 17 | Judge:     Nathanael M. Cousins |

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................... 1

INTEREST OF AMICUS CURIAE .............................................................................. 1

DISCUSSION ................................................................................................................ 2

    A.    THE BROADCAST OF A SPORTING EVENT DOES NOT IMPLICATE THE PARTICIPANTS' "NAME AND LIKENESS" RIGHTS ................................................................... 3

    B.    ANY CLAIMS RELATING TO BROADCASTS OF SPORTING EVENTS ARE PREEMPTED BY THE COPYRIGHT ACT ................................................................................... 4

    C.    PLAINTIFFS' ARGUMENT IS ALSO FORECLOSED BY THE SUPREME COURT'S DECISION IN NCAA V. BOARD OF REGENTS ................................................................................. 6

    D.    THIS COURT'S REFUSAL TO DISMISS PLAINTIFFS' CLAIMS DOES NOT ESTABLISH THAT THE BROADCAST AGREEMENTS ARE RELEVANT ....................... 8

    E.    DISCLOSING THE TERMS OF CONFIDENTIAL BUSINESS AGREEMENTS WILL CAUSE IRREPARABLE HARM ........................................................................................... 9

CONCLUSION ............................................................................................................ 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663 (7th Cir. 1986) .................................................................................................................................. 5, 6

*Best v. Berard*, 776 F. Supp. 2d 752 (N.D. Ill. 2011) ................................................................ 3

*Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536 (1993) ..................................................... 3

*Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889 (6th Cir. Tenn. 1991) ............. 3

*Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911 (1996) ..................................................................... 6

*Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255 (S.D. Fla. 2010) ...................... 4

*Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307 (Cal. App. 1st Dist. 2001) ............. 3

*In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 2011 U.S. Dist. LEXIS 82682 (N.D. Cal. July 28, 2011) ........................................................................................... 7

*Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146 (9th Cir. 2010) ..................... 5

*Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006) .............................................. 6

*National Football League v. Alley, Inc.,* 624 F. Supp. 6 (S.D. Fla. 1983) ................................ 4

*NCAA v. Board of Regents,* 468 U.S. 85 (1984) .................................................................. 3, 7

*United Techs. Corp. v. Mazer*, 2007 U.S. Dist. LEXIS 17981 (S.D. Fla., Mar. 14, 2007) .............. 2

*Wood v. Vista Manor Nursing Ctr. Life Generations Healthcare, Inc.*, 2007 U.S. Dist. LEXIS 22643 (N.D. Cal. Mar. 16, 2007) ......................................................................................... 2

**Statutes**

17 U.S.C. § 106 ....................................................................................................................... 4, 5

17 U.S.C. § 301 ....................................................................................................................... 4, 6

765 ILCS 1075/35(b)(2) (West 2002) ......................................................................................... 4

Cal. Civ. Code § 3344(d) ............................................................................................................ 3

Title 17 of the United States Code ............................................................................................. 2

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Rules**

Fed. R. Civ. P. 45 ................................................................................................................ 1, 2

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- iii -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

## PRELIMINARY STATEMENT

Plaintiffs filed two motions to compel in the United States District Court for the Northern District of Illinois seeking, among other things, broadcast agreements from the Big Ten Conference and the Big Ten Network (the "Big Ten Motions"). Those motions have been transferred to this Court. Plaintiffs have also served subpoenas and/or motions to compel seeking broadcast agreements from numerous other conferences, universities, and broadcast companies. In doing so, plaintiffs are seeking to force non-parties to produce highly confidential television broadcast agreements that are simply are not relevant to the plaintiffs' claims against the NCAA, EA Sports and Collegiate Licensing Company ("CLC"). Accordingly, to the extent that Plaintiffs seek broadcast agreements, their motions to compel should be denied.

## INTEREST OF AMICUS CURIAE

The Southeastern Conference (the "SEC") is an unincorporated association of colleges and universities headquartered in Birmingham, Alabama. Along with the Big Ten Conference, the Big Ten Network and dozens of other third parties, the SEC (in August 2011) received a non-party document subpoena from the plaintiffs pursuant to Rule 45 of the Federal Rules of Civil Procedure. Among other documents, the plaintiffs sought the SEC's television broadcast agreement with ESPN and the Bowl Championship Series ("BCS") television broadcast agreements.

After a lengthy meet and confer process, the plaintiffs filed a motion to compel against the SEC in the Northern District of Alabama in December 2011 (the "SEC Motion"). The SEC declined to produce the ESPN and BCS television broadcast agreements because (among other reasons) those agreements are not relevant to the plaintiffs' claims against the NCAA, EA Sports and CLC. In addition, the agreements are confidential, and disclosure of the terms of those agreements would cause irreparable harm to the SEC. Judge Virginia Emerson Hopkins, before

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- 1 -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

whom the SEC Motion is pending, has indicated that she will either transfer the motion to this Court, or will look to this Court's decision with respect to the Big Ten Motions when determining whether the broadcast agreements sought from the SEC are relevant. The SEC will therefore be directly impacted by this Court's decision regarding the relevancy of television broadcast agreements.

## DISCUSSION

Television broadcast agreements are not relevant to the plaintiffs' claims against the NCAA, EA Sports or Collegiate Licensing Company, and are therefore not subject to subpoena under Rule 45. *See, e.g., Wood v. Vista Manor Nursing Ctr. Life Generations Healthcare, Inc.*, 2007 U.S. Dist. LEXIS 22643, 8-9 (N.D. Cal. Mar. 16, 2007) (holding that non-party may object to subpoena based on relevance); *United Techs. Corp. v. Mazer*, 2007 U.S. Dist. LEXIS 17981, 3-4 (S.D. Fla., Mar. 14, 2007) (same). Federal Rule of Civil Procedure 45 does not afford a party a "fishing license" that provides unlimited access to documents without regard to whether those documents relevant and discoverable in the underlying action. *Id.*

Plaintiffs have argued that the broadcast agreements are relevant because (i) the NCAA (through its members, presumably) has allegedly conspired to deprive former student athletes of the right to profit from licenses of rights to their name and likeness and/or has profited through licenses of name and likeness rights of former student athletes, and (ii) the broadcast agreements somehow (in some unarticulated way) have a bearing on that claim, or are pertinent to a measure of damages. Plaintiffs' arguments are flawed for at least three reasons.

First, it is settled law that a broadcast and any rebroadcasts of a sporting event does not implicate the "name and likeness" rights of the participants in the sporting event. Second, the Copyright Act grants the broadcaster of a sporting event the *exclusive* right to broadcast, rebroadcast and license the broadcast and rebroadcast of the event and preempts any claims based

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- 2 -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

on such broadcasts and rebroadcasts. Finally, the United States Supreme Court expressly held in *NCAA v. Board of Regents,* 468 U.S. 85, 101-02 (1984), that the NCAA may condition participation in collegiate athletics on the maintenance of amateur status by the participants, which further confirms that plaintiffs have no basis for claiming that NCAA members should be forced to make payments to former college athletes in connection with broadcasts or rebroadcasts of sporting events.

### A. The Broadcast Of A Sporting Event Does Not Implicate The Participants' "Name And Likeness" Rights.

What plaintiffs call a "misappropriation of name and likeness" is actionable, if at all, as a violation of the right of publicity. *See, e.g., Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc*., 936 F.2d 889, 897 (6th Cir. Tenn. 1991) (use of name, image or likeness actionable if use violated a right of publicity). Broadcast agreements can have no relevance to a claim concerning misappropriation or misuse of "name and likeness" rights because there is no common law or statutory right for a person to be paid when their name or image appears in a broadcast. *See Dora v. Frontline Video, Inc.*, 15 Cal. App. 4th 536, 542 (1993) (dismissing statutory and common law claims by surfer against film production company and holding that production company did not need surfer's consent); *see also Best v. Berard*, 776 F. Supp. 2d 752 (N.D. Ill. 2011); *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr. 2d 307 (Cal. App. 1st Dist. 2001). In fact, California statutory law explicitly provides that television networks are not required to obtain athletes' consent to use their name and likeness when televising or otherwise broadcasting sports events. *See* Cal. Civ. Code § 3344(d) ("a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account . . . shall not constitute a use for which consent is required"). The same is true for the Illinois Right of Publicity Act, which specifically exempts "use of an individual's identity for non-commercial purposes, including any

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

news, public affairs, or sports broadcast or account[.]" 765 ILCS 1075/35(b)(2) (West 2002). Florida law is the same. *E.g., Fuentes v. Mega Media Holdings, Inc*., 721 F. Supp. 2d 1255, 1258 (S.D. Fla. 2010); *National Football League v. Alley, Inc.,* 624 F. Supp. 6, 10 (S.D. Fla. 1983). The SEC is aware of no state law to the contrary.

Because an athlete cannot require payment for any alleged "use" of his name or image in broadcasts or rebroadcasts of sporting events, broadcast agreements can have no relevance to the plaintiffs' claims against the NCAA, EA Sports and CLC. Put another way, plaintiffs cannot have a claim for damages based on broadcasts or rebroadcasts of sporting events because "right of publicity" law does not prohibit such broadcasts or impose any requirement to pay any compensation to any athlete in connection therewith.[1]

### B. Any Claims Relating To Broadcasts Of Sporting Events Are Preempted By The Copyright Act.

It is equally clear that the broadcaster of a sporting event obtains a copyright in the broadcast of that event. Under Section 106 of the Copyright Act, 17 U.S.C. § 106, the copyright holder enjoys the exclusive rights to the broadcast (including but not limited to the right to effect or license delayed broadcasts of full games, highlights and/or clips). Plaintiffs do not dispute that the broadcasters obtain an exclusive copyright to broadcast, rebroadcast, and otherwise distribute video, footage and images of college sporting events that they film. Plaintiffs nevertheless apparently seek to challenge various copyright holders' rights to rebroadcast, distribute and sell copyrighted footage and images of college sporting events in which plaintiffs participated on the theory that such broadcasts somehow violate plaintiffs' rights in their own names and likenesses.

Plaintiffs may or may not have a claim based on alleged uses of their images on products

---

[1] This legal structure comports with common sense and practical reality. Student-athletes know their games are being broadcast and often want to expand the number of broadcasts so they can watch themselves on television more often.

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- 4 -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

or in the EA Sports video games. This amicus submittal does not attempt to address such uses. It is abundantly clear, however, that plaintiffs cannot have a claim based on broadcasts or rebroadcasts of sporting events in which they appeared – and that broadcast agreements for such events can therefore have no relevance in this action, and are not discoverable. Section 301 of the Copyright Act expressly preempts any and all state law right of publicity claims that would impinge or limit the exclusive rights provided to a copyright holder in Section 106 of the Copyright Act. *See, e.g., Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1154 (9th Cir. 2010). Accordingly, courts have uniformly rejected plaintiffs' claim that the broadcast and rebroadcast of the copyrighted footage can give rise to a cause of action for misappropriation of rights of publicity (or in plaintiffs' non-legal terminology, for misappropriation of name and likeness). *Id.*[2]

In *Jules Jordan*, the Ninth Circuit addressed the issue squarely and held that a person appearing in a copyrighted video has no basis under right of publicity law to seek compensation for broadcasts or rebroadcasts of the video. 617 F.3d at 1154. Similarly, in *Baltimore Orioles, Inc. v. Major League Baseball Players Association*, 805 F.2d 663 (7th Cir. 1986), the Seventh Circuit specifically addressed whether an athlete could assert any rights of publicity in the broadcast and distribution of footage from copyrighted baseball games. The Court held that copyright owners' rights in the broadcasts preempted the players' rights of publicity. *Id.* at 674 (holding that athletes' lawsuit was preempted because their attack on copyright holders' television distribution rights was equivalent to claims covered by Copyright Act). *Jules Jordan*

---

[2] To clarify, the SEC does not urge this Court to conclude that the Copyright Act somehow prevents former college athletes from being paid for endorsements. As the various filings in the Northern District of Alabama make clear, the SEC has never purported to grant any person or entity the right to use copyrighted video for endorsement of a product. Put another way, if a sports beverage manufacturer wanted to use video of a star quarterback throwing a touchdown pass while he was a college player to promote its product, the manufacturer would be required to license the endorsement rights from the quarterback himself – and license the copyright to the video separately, from the copyright holder.

and *Baltimore Orioles* are but two of a long line of cases all reaching the same result. *See Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911, 1924 (1996) (holding that actor's claim against movie studio asserting right of publicity in motion picture was preempted by Copyright Act); *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1141 (9th Cir. 2006) (holding that federal copyright law preempted singer's right of publicity claim against record label).

Plaintiffs can have no claim arising from or relating to broadcasts and rebroadcasts that a copyright holder has an absolute right to make under Section 106 of the Copyright Act, so the broadcast agreements authorizing such broadcasts and rebroadcasts cannot be relevant or discoverable in this action.

### C. Plaintiffs' Argument Is Also Foreclosed By the Supreme Court's Decision In *NCAA v. Board Of Regents*

The SEC cannot conceive of an antitrust argument that would survive the two points made above. Given that broadcasts of sporting events do not, as a matter of law, misappropriate the names or likenesses of participants in those events – and given the exclusive rights granted to the copyright holder under the Copyright Act and the express preemption of state law claims by §301 of the Copyright Act – it would be impossible for plaintiffs to construct any antitrust claim based on the notion that they have been the alleged victims of an antitrust conspiracy. Put another way, even if plaintiffs had a viable antitrust claim of some sort, under these basic legal principles, it could not be based on an alleged wrongful use of their names and likenesses in broadcasts or rebroadcasts of sporting events. In fact, as noted in filings in connection with the SEC Motion pending in the Northern District of Alabama, when counsel for the SEC has asked plaintiffs' counsel for support for such a claim, they have not provided any case cites or articulated any legal theories.

While perhaps unnecessary to a determination that broadcast agreements cannot be

- 6 -   AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

relevant or discoverable in this action, it is important to note one added flaw in plaintiffs' position. Plaintiffs ignore the Supreme Court's decision in *NCAA v. Board of Regents*, 468 U.S. 85, 101-02 (1984). In that decision, the Supreme Court expressly validated the NCAA's basic model of amateur athletics. As the Court explained, for amateur sports to exist, "athletes must not be paid, must be required to attend class, and the like. . . . Thus, the NCAA plays a vital role in enabling college football to preserve its character, and as a result allows a product [amateur sports broadcasts] to be marketed which might otherwise be unavailable."[3]

Under the precedent established by *Board of Regents*, television broadcast agreement have no relevance to a claim against the NCAA for misappropriation of name and likeness rights. Even if broadcasting sporting events did constitute a misappropriation of name and likeness rights (which it does not, for the reasons explained above), *Board of Regents* allows the NCAA to condition participation in college sports on maintenance of amateur status. Paying athletes for appearing in broadcasts—either while they are enrolled or promising to do so after they leave college—would fly in the face of the precedent set by *Board of Regents*. Judge Wilken has already implicitly recognized this key point, noting that payments to student athletes with respect to broadcasts and rebroadcasts of athletic events because the payments would "destroy those students' eligibility to compete as student-athletes." *In re NCAA Student-Athlete Name & Likeness Licensing Litigation*, 2011 U.S. Dist. LEXIS 82682, *14 (N.D. Cal. July 28, 2011).[4]

In summary, broadcast agreements have no relevance to plaintiffs' claims for

---

[3] The Court further noted that in so doing the NCAA "widen[s] consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive." *Id.* (emphasis added). As the Supreme Court thus recognized, college athletes know they will not be compensated beyond receipt of scholarships as allowable by NCAA rules, and are free to choose not to participate in collegiate athletics if that limitation is unacceptable to them. It is certainly no secret to student-athletes that their games are broadcast. In fact, SEC student athletes sign a form that includes language explicitly acknowledging this fact. *See* Declaration of Charlie Hussey, 2:11-mc-4184-VEH (Dkt. No. 9, Exhibit 4, ¶ 7).

[4] It bears noting that paying the student athletes only after they graduate would not be a viable approach. Promises of payments in the future have the same effect on amateur status as would current payments.

"misappropriation of name and likeness" or for an alleged antitrust conspiracy to deprive them of the right to profit from their name and likeness. The law flatly establishes that a person appearing in a broadcast of a sporting event has no individual right to be paid by the broadcaster that was "misappropriated" directly, or through a purported conspiracy. Moreover, even if such a right did exist, the Supreme Court in *Board of Regents* held that the NCAA can prohibit student athletes from being paid in order to "allow[] a product [amateur college sports] to be marketed which might otherwise be unavailable."

### D. This Court's Refusal To Dismiss Plaintiffs' Claims Does Not Establish That The Broadcast Agreements Are Relevant.

Plaintiffs have argued that the denial of motions to dismiss their claims against the NCAA, EA Sports and CLC somehow establishes that television broadcast agreements are relevant. In fact, when pressed for support for their position that broadcast agreements are relevant and discoverable, this has been their only response.

A review of the briefing and orders on those motions to dismiss confirms that neither the Court nor the defendants addressed the law unique to broadcasts and broadcast agreements (probably because the Consolidated Amended Complaint and prior complaints focus on product sales and mention broadcasts only in passing). While some portions of Judge Wilken's opinions reference the allegation in the Consolidated Amended Complaint that the NCAA enters into "licensing agreements with companies that distribute products containing student athlete's images," that language has no applicability here since broadcast agreements and rights are not "products" (and are treated quite differently than products from a legal perspective, as is explained in Sections A and B above) *See* Feb. 8, 2010 Order, 2010 WL 445190, at *2. Similarly, although Judge Wilken's discussion of the relevant market makes a passing reference to "agreements for the broadcast of athletic events" that were identified in plaintiffs' complaint,

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- 8 -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

this off-hand remark does not, by any stretch, amount to a "ruling" that all college sports television broadcast agreements are relevant. *See* Feb. 8, 2010 Order, 2010 WL 445190, at *5. In a thorough search of the PACER docket, counsel for the SEC can find no instance in which the arguments hereinabove have been presented to the Court.

### E. Disclosing The Terms Of Confidential Business Agreements Will Cause Irreparable Harm.

The broadcast agreement entered into by the SEC with ESPN contains sensitive and confidential business information. *See* Declaration of Mark Womack, 2:11-mc-4184-VEH (Dkt. No. 9, Exhibit 1, ¶ 7). Neither the NCAA, the Big Ten, nor any other conference has knowledge of the terms of the SEC's agreement with ESPN. The SEC's agreement with ESPN has unique terms that were highly negotiated. The SEC could be compromised in future negotiations if it cannot assure parties that the confidentiality of its business agreements will be maintained. *Id*. It risks obtaining less favorable contractual terms in future negotiations if it cannot maintain the confidentiality of its agreements. *Id*. Moreover, the agreement contains a confidentiality provisions and the SEC's relationships with important parties such as ESPN would be significantly damaged if it is forced to disclose to financial and non-financial terms of the agreements. *Id*. These same concerns apply to the BCS agreements as well (although, unlike the SEC-ESPN agreement, other conferences presumably have copies of the BCS agreements).

This concern regarding confidentiality is only magnified by the fact that the terms of the protective order entered in this action permit disclosure to a wide range of parties, including in-house and outside counsel, party deposition and trial witnesses, consultants, expert witnesses and litigation support providers. *See* Declaration of Robert Fuller, 2:11-mc-4184-VEH (Dkt. No. 10, ¶¶ 7-8). This is true even of documents designated as "Counsel Only." *Id*. The PACER docket report for this litigation indicates that at least fifty-five (55) law firms and over 120 attorneys

ROBINSON
BRADSHAW &
HINSON, P.A.
ATTORNEYS AT LAW

- 9 -

AMICUS CURIAE BRIEF
Civil Case No. 4:11-mc-80300 CW (NC)

have entered appearances, most of whom represent one or more of the plaintiffs in the various actions that have been consolidated. *Id.*, ¶ 9. Moreover, counsel for the NCAA and for the other conferences are not privy to the SEC's agreement with ESPN – and in some instances are not privy to the BCS agreements either. It is a virtual certainty that the terms of these television broadcast agreements will become publicly known if they are produced, regardless of whether they are designated as "Counsel Only."

Thus, even if the broadcast agreements were in fact relevant and discoverable, the confidentiality provisions in the protective order would provide insufficient protection to the SEC. As a result, the discovery plaintiffs seek, if provided, would result in information being shared among competitors that is not currently public or otherwise available. The SEC respectfully suggests that this would be inappropriate for many reasons, even if the broadcast agreements were relevant and discoverable.

## **CONCLUSION**

Through their motions to compel, plaintiffs seek the production of broadcast agreements that simply have no relevance to their claims against the NCAA, EA Sports and CLC. The SEC asks the Court to confirm that, under the legal precedent cited above, plaintiffs have no common law or antitrust claim for "misappropriation" or "misuse" of their name and likeness based on appearances in broadcasts and rebroadcasts of sporting events – and that therefore the broadcast agreements cannot be relevant or discoverable.

Dated: January 31, 2012                                         Robinson Bradshaw & Hinson, P.A.


By: s/ Nathan C. Chase, Jr.
    Nathan C. Chase, Jr.
    *Attorneys for Amicus Curiae*
    *The Southeastern Conference*